The PEOPLE of the State of
Colorado, Petitioner,

v.

Lester L. NEWTON, Respondent.

No. 97SC85.

Supreme Court of Colorado.

Sept. 14, 1998.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russell, First Assistant Attorney General, Clemmie P. Engle, Senior Assistant Attorney General, Criminal Enforcement Section, Denver, for Petitioner.

Gerash, Miranda & Gerash, P.C., Walter L. Gerash, Lia A. Fazzone, Denver, for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

Lester Newton, the defendant in this case, was tried in the Arapahoe County District Court (trial court) for his involvement in an armed robbery of a local grocery store in Aurora, Colorado. Ronald Riley, a co-defendant, was tried jointly with Newton. At trial, the People called Evonne Cummins, who was Newton's girlfriend at the time of the robbery, to testify about her knowledge of the robbery. Cummins refused to answer the prosecutor's questions, repeatedly invoking her right not to testify under the Fifth Amendment to the United States Constitution in the presence of the jury. After Cummins refused to testify, the People called a police detective to whom Cummins had provided a statement shortly after the robbery. In that statement, Cummins indicated her knowledge of the robbery and Newton's involvement in it. Over defense counsel's objection, the trial court allowed the People to

question the detective regarding what Cummins had told him.

A jury convicted Newton of aggravated robbery, theft, and menacing. The court of appeals reversed Newton's conviction and remanded the case to the trial court for a new trial. *See People v. Newton*, 940 P.2d 1065 (Colo.App.1996). In its opinion, the court of appeals adopted the United States Supreme Court's interpretation of Fed.R.Evid. 804(b)(3) in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), for purposes of CRE 804(b)(3), which provides for the admission of a declarant's hearsay statement that is against the declarant's interest.[1] The court of appeals explained that under *Williamson*, the trial court may admit only an individual remark that inculpates the declarant. Applying its construction of CRE 804(b)(3) to this case, the court of appeals held that Cummins's statement to the police detective was not admissible, with the possible exception of one remark.

We granted certiorari to review the court of appeals' adoption and application of the *Williamson* decision to CRE 804(b)(3).[2] Although we affirm the court of appeals' judgment reversing Newton's convictions, we reject the court of appeals' interpretation of CRE 804(b)(3). We hold that under CRE 804(b)(3), a trial court should admit the precise statement against penal interest contained in a declarant's narrative as well as related, collaterally neutral statements. Admission of a declarant's statement against penal interest is subject to two limitations. First, a trial court should exclude any of the declarant's remarks that are so self-serving as to be unreliable. Second, if the trial court determines that the statement is unreliable

because the declarant had a significant motivation to curry favorable treatment, then the entire narrative is inadmissible.

## I.

On the morning of April 1, 1993, several men entered a King Soopers grocery store in Aurora and robbed a Wells Fargo guard who was delivering approximately $78,500 in cash and $7,800 in King Soopers gift certificates to the store. According to the Wells Fargo guard's trial testimony, three men wearing masks approached him as he was heading toward the office located in the store. At least two of the three suspects were armed. One suspect told the guard to drop the bag containing the funds and to raise his hands. Another suspect removed the guard's revolver and took the bank bag containing the funds.

Shortly after the robbery, the Aurora police located a vehicle matching witnesses' description of the getaway car at a nearby apartment complex. The police established a perimeter search of the complex and began searching individual apartments. Shervin Bunch, the lessee of apartment #10, consented to a search of his apartment. The police found four persons inside apartment #10: Shervin Bunch, Samuel Bunch (Shervin Bunch's brother), Lester Newton, and Evonne Cummins. In addition, the police found several handguns, approximately $2,700 in cash, several thousand dollars in King Soopers certificates, and bank bags inside the apartment.

Meanwhile, three men were seen fleeing from apartment #10 through a window. The police subsequently found them in

1. CRE 804(b)(3) provides in relevant part:
 A statement which was at the time of its making ... so far tended to subject [the declarant] to ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

2. We granted certiorari on the following two issues:

1. Whether the court of appeals erred in adopting the rule of *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), regarding the hearsay exception for statements against penal interest.
2. Whether the court of appeals erred in its application of the *Williamson* rule.

Because we hold that the court of appeals erroneously adopted *Williamson* for purposes of CRE 804(b)(3), it is unnecessary to reach the second issue upon which we granted certiorari.

bushes close to the apartment and identified them as Ronald Riley, Gregory McCoy, and Tyree Bronson. In their search of McCoy, the police found approximately $20,000 stuffed in McCoy's pockets, socks, shorts, and shirt. The police also found a bag containing several thousand dollars in money orders on the roof above the suspects.

After questioning the four persons inside the apartment, the police arrested, processed, and then released Cummins and Newton. The police also arrested Riley, McCoy, and Bronson for aggravated robbery. In an affidavit in support of a warrantless arrest of Newton, an Aurora police officer stated that McCoy gave a confession after receiving his *Miranda* advisement. According to the officer, McCoy admitted his involvement in the robbery and stated that Newton, Riley, and Bronson were co-participants. As a result, the police then arrested Newton again for aggravated robbery.[3]

Six days following the April 1, 1993 incident, Cummins, who was then 17 years old, came voluntarily to the Aurora police station with her mother. Detectives Parker and Callahan interviewed Cummins in the presence of her mother. According to Detective Parker's testimony, Cummins informed him about the following events that occurred on April 1. Cummins stated that she was at apartment #10 on the morning of April 1. She heard a knock on the door and Newton and Bronson then entered the apartment, followed by Riley and McCoy. Newton, Bronson, Riley, and McCoy then went to the bedroom of the apartment. Shervin Bunch asked her what happened and she informed him that the four persons had just committed a robbery. Bunch then went into the bedroom for approximately five minutes. Newton, who had entered the bedroom

wearing a black hooded sweatshirt and black sweatpants, came out of the bedroom wearing white boxer shorts and a white T-shirt. Cummins then went to take the trash out from the apartment and observed that the police had surrounded the building. She returned to the apartment and informed everyone that the police had surrounded the building. Newton told everyone "to be cool because the cops couldn't come in." When the police knocked at the door, Bronson, McCoy, and Riley went out the window and started running.

At trial, the People sought unsuccessfully to have Cummins testify about the statement she provided to Detective Parker. Although the People granted Cummins immunity, Cummins informed the court outside the presence of the jury that she would invoke her Fifth Amendment right not to testify.[4] The prosecution argued, and the trial court agreed, that the People could call Cummins to the witness stand and that if she refused to testify, the People could question Detective Parker about the statement Cummins made to him as a prior inconsistent statement under CRE 801(d)(1).[5] To establish a foundation for Detective Parker's testimony, the People asked Cummins leading questions about the statement she made to Detective Parker. Cummins refused to answer the People's questions, asserting her Fifth Amendment right not to testify a total of fifteen times in front of the jury. Immediately after questioning Cummins, the People called Detective Parker, who testified about the statement Cummins gave him.

During the course of the trial, the People advanced a theory of the case which differed significantly from that advanced by Newton. According to the People, although no witness saw more than three robbers together, the

---

3. Newton and Riley were tried separately from McCoy. McCoy's confession was not introduced into evidence in Newton and Riley's trial.

4. At the in camera hearings in which the trial court considered the issue of Cummins's testimony, counsel for Cummins stated that he advised Cummins not to testify. According to Cummins's counsel, he believed that Cummins would be subject to criminal prosecution for violating federal law in spite of the district attorney's grant of immunity.

5. CRE 801(d) exempts certain statements from the hearsay definition. CRE 801(d)(1) provides in relevant part:

> Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony.

cumulative effect of the testimony demonstrated that there were four robbers involved. Specifically, the People argued that three persons went inside the King Soopers store, while a fourth person waited outside in the getaway car. The People asserted that no witness saw all four persons because passengers in the getaway car were "ducking down." By contrast, Newton argued that the evidence did not demonstrate that four persons were involved in the robbery and disputed the People's "duck down" argument.

Additionally, the evidence was conflicting as to when Newton arrived at apartment # 10. The People pointed to evidence showing that Newton arrived at the apartment after the robbery. In addition to Cummins's statement to Detective Parker, Shervin Bunch testified that he, Samuel Bunch, and Cummins were eating breakfast when Newton and three other men whom he did not know entered the apartment. According to Bunch, the four men proceeded to the bedroom. After a while, he entered the bedroom and saw that the four men had guns and money. Bunch asked for some of the money, which Newton gave him. Bunch also testified that Newton told him he "took care of business ." After Newton and Riley's counsel impeached Bunch,[6] Detective Parker testified that Bunch told him essentially the same story during an interview the day after the robbery. To dispute the People's theory, Newton's counsel highlighted contrary evidence indicating that Newton had been at the apartment all morning. To that effect, Bronson testified that only he and two other persons committed the robbery and that there was not a fourth person in the getaway car. According to Bronson, Newton was already in apartment # 10 when he and the other two robbers entered.

Following a six-day jury trial, the jury found Newton guilty of two counts of aggravated robbery, see § 18–4–302, 6 C.R.S. (1997), one count of theft, see § 18–4–401, 6 C.R.S. (1997), and three counts of menacing, see § 18–3–206, 6 C.R.S. (1997).

On appeal, the court of appeals reversed the convictions and remanded the case for a new trial. See Newton, 940 P.2d at 1067–70. The court of appeals first explained that the trial court erred by allowing the People to call Cummins as a witness, knowing that Cummins would assert her right not to testify in the jury's presence. See id. at 1067. Rejecting the People's argument that the error did not prejudice Newton, the court of appeals went on to explain that Cummins's statement was not admissible under CRE 801(d)(1)(A) as a prior inconsistent statement, nor was it admissible under CRE 804(b)(3) as a statement against penal interest. See id. at 1068–70. In its analysis, the court of appeals adopted the United States Supreme Court's interpretation of Fed. R.Evid. 804(b)(3) in Williamson. The court of appeals stated that, under its reading of Williamson, the only part of Cummins's statement that "might be considered against her penal interest" was her indication that she knew that Newton and others had just committed a robbery. Id. at 1069. The court of appeals refused to address whether that part of Cummins's statement was admissible, however, because the court of appeals indicated that the People did not argue at the trial court level that the statement was admissible under CRE 804(b)(3).[7] See id. After concluding that the admission of Detective Parker's testimony was erroneous, the court of appeals also rejected the People's argument that the statement was merely cumulative to other evidence in the case. See id. at 1069–70. Thus, the court of appeals

---

**6.** This impeachment included, among other things, Bunch's admission that he was not truthful to the police when they first arrived at apartment # 10 and questioned him about who was at the apartment.

**7.** The court of appeals' explanation that the People did not argue that the statement was admissible under CRE 804(b)(3) is not consistent with the record. In the context of arguing that Detective Parker's testimony would not violate Newton's rights under the Confrontation Clause, the prosecutor made the following argument to the trial court:

> They are also statements against her interest because they implicate her in this particular crime in this particular situation as an aider and abetter, and she's sorry after the fact. So they are statements against interest. And it would also fall within the exception under 804 for that purpose.

held that the extensive questioning of Cummins and the admission of Detective Parker's testimony describing Cummins's statement to him were not harmless error.

## II.

■ Before considering the People's argument that this court should not follow *Williamson*, we address the consequences that follow from the trial court's error in allowing the People to call Cummins as a witness when the trial court knew Cummins would refuse to testify on Fifth Amendment grounds. In the court of appeals and in this court, the People conceded that the trial court erred by allowing the People to call Cummins to the witness stand where she repeatedly invoked her right not to testify. *See id.* at 1067. As they argued in the court of appeals, the People contend here that the error was not prejudicial and that a new trial is not necessary. *See id.* at 1068–70. In rejecting the People's argument, the court of appeals implicitly recognized that the trial court's error did not automatically require reversal. *See id.* While we agree that the trial court's error in this case did not automatically require a new trial, it is necessary to clarify the factors that an appellate court should consider when reviewing this type of error.

### A.

In *DeGesualdo v. People*, 147 Colo. 426, 432–33, 364 P.2d 374, 378 (1961), this court held that the trial court erred when it allowed the prosecutor to call as a witness the defendant's alleged accomplice for the purpose of extracting from the accomplice a claim of privilege. In *DeGesualdo*, we explained that if the prosecutor called the witness in good faith or if the court instructed the jury to disregard the witness's invocation of the right not to testify, then "the conduct could be overlooked." *DeGesualdo*, 147 Colo. at 430, 364 P.2d at 377.

Following *DeGesualdo*, we addressed similar errors in other cases. For example, in *Billings v. People*, 171 Colo. 236, 242–44, 466 P.2d 474, 477–78 (1970), the defendant asserted that the trial court erred by allowing the prosecutor to call the defendant's wife to the witness stand knowing that she would assert her constitutional right not to testify. We stated:

> The rule of *DeGesualdo* is that a prosecutor commits reversible error if, knowing that an accomplice will claim the privilege against self-incrimination, he calls the accomplice to the stand for the purpose of extracting the claim of privilege from him.

*Billings*, 171 Colo. at 242, 466 P.2d at 477.

In *People v. Scheidt*, 182 Colo. 374, 383–84, 513 P.2d 446, 451 (1973), we rejected the defendant's argument that the trial court committed reversible error when it allowed the People to call a witness to whom it had granted immunity. In that case, we explained that once the People have granted a witness immunity, the prosecution does not have to assume that the witness will violate the law by not testifying. *See Scheidt*, 182 Colo. at 383–84, 513 P.2d at 451. Rather, a reviewing court should determine whether, under the totality of the circumstances, the error required reversal. *See id.*

### B.

■ *Scheidt* did not fully explain what factors a court should analyze under the totality of circumstances test when reviewing this type of error, although it recognized there is controlling precedent from the United States Supreme Court. *See id.* (citing *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963)). In *Namet*, the Supreme Court articulated two principles upon which a prosecution witness's assertion of the Fifth Amendment right not to testify may constitute reversible error. *See Namet*, 373 U.S. at 186–87, 83 S.Ct. 1151. First, reversible error exists when the prosecution engages in prosecutorial misconduct, which is a "conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186, 83 S.Ct. 1151. Second, it is reversible error when, "in the circumstances of a given case, inferences from a witness'[s] refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. 1151. The Supreme Court

subsequently gave the *Namet* decision constitutional status in *Douglas v. Alabama,* 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), where the Court held that the defendant's rights secured by the Confrontation Clause of the Sixth Amendment were violated when the prosecutor called to the witness stand a previously tried and convicted co-defendant who refused to testify under the Fifth Amendment. *See generally Rado v. Connecticut,* 607 F.2d 572, 581 (2d Cir.1979) (explaining that the *Namet* principles "were given constitutional significance and made applicable to the states" in *Douglas* ). Thus, we are bound by *Douglas* to follow *Namet.*

▮ Federal appellate decisions give helpful guidance in applying *Namet.* In *Rado,* the Second Circuit reviewed various factors that courts have considered under *Namet. See Rado,* 607 F.2d at 581. The *Rado* court explained:

> In applying the *Namet* rule to particular cases, the courts have analyzed various factors, including the prosecutor's intent in calling the witness, the number of questions asked, their importance to the state's case, whether the prosecutor draws any

inference in his closing argument from the witness'[s] refusal to answer ... and whether the trial judge gives a curative instruction.

*Id.* (citations omitted). *See also United States v. Victor,* 973 F.2d 975, 979 (1st Cir. 1992) (applying similar factors under *Namet* ). In our view, the totality of circumstances test for reviewing this type of error should include the factors summarized by the *Rado* court.

C.

▮ Applying the totality of circumstances test here, we conclude that the trial court's error requires reversal of Newton's conviction.[8] On the one hand, it does·not appear that the prosecutor acted in bad faith by calling Cummins solely to raise adverse inferences from her refusal to testify. Rather, the prosecutor erroneously believed that Cummins's refusal to answer questions constituted "testimony" and that her statement to Detective Parker then would be admissible as a prior statement that was inconsistent with her trial testimony.[9] The record re-

8. Although it is possible to remand this case to the court of appeals to consider whether a new trial was warranted under *Namet,* we proceed to address this issue in the interest of judicial economy. *See Romer v. Colorado Gen. Assembly,* 810 P.2d 215, 225 (Colo.1991) (explaining that the supreme court could apply the legal test to the uncontroverted evidence in the record and that "[i]n the interest of judicial economy, we choose to settle that question rather than remand"); *Kane v. Town of Estes Park,* 786 P.2d 412, 414 n. 2 (Colo.1990) ("In the interest of judicial economy, we elect to address the issues remaining instead of remanding the case to the Colorado Court of Appeals."). Our decision to address this issue is also consistent with the.People's position taken at oral argument when the question of this court's disposition of the case arose. Counsel for the People expressly stated that even if we decide that Cummins's statement could have been admitted under CRE 804(b)(3), this court "may want to determine that the prejudicial effect of having her [Evonne Cummins] claim the Fifth in the presence of the jury in and of itself is enough to warrant reversal." Additionally, the People prefaced this suggested disposition by referring to the People's reply brief submitted in response to Newton's brief opposing the People's petition for certiorari. Indeed, in that brief, the People argued that the applicable standard for reversal under *Namet* is the one we adopt here. Thus, in our view, it is appropriate for this court to apply

*Namet* and Douglas to the circumstances of this case and to consider whether reversal is required due to the trial court's error in allowing the People to call Cummins to the stand where she repeatedly invoked her right not to testify.

9. Although the reasoning was clearly wrong, the prosecutor's argument apparently was not unique to this case. During an in camera hearing in which the trial court considered the issue of whether the People could call Cummins to the stand, the following colloquy took place:

> [Prosecutor]: I can't lay claim to this idea myself. It's something that we use in a large majority of trials out of Limon, quite frankly, because that's where most frequently we have situations where we have other witnesses, primarily in that instance, prisoners from the prison who don't want to talk anymore. We use the same technique with them. That's where this idea came from for this trial.
> [The court]: You said you did it where?
> [Prosecutor]: In Limon. It is—I have done it myself, Judge. [Another prosecutor] from my office, it was his idea.

The court of appeals correctly concluded that admitting evidence under this theory was error. *See Newton,* 940 P.2d at 1068 ("[B]ecause the girlfriend did not give testimony when she refused to answer the prosecutor's questions, she gave no testimony with which any prior statement could be inconsistent.").

flects that, with the trial court's consent, the prosecutor called Cummins in order to lay a foundation for Detective Parker's testimony regarding the statement Cummins gave to him. Additionally, while the prosecutor referred to the substance of Cummins's statement in closing arguments, the prosecutor neither referred to Cummins's refusal to testify, nor attempted to draw adverse inferences from Cummins's refusal to testify.[10]

On the other hand, however, the prosecutor compelled Cummins to invoke her right not to testify in front of the jury not once or twice, but a total of fifteen times. Further, dispute over whether the prosecutor could call Cummins to the witness stand and have Detective Parker testify about her statement consumed nearly an entire afternoon session of a six-day trial. At one point, the trial court ordered the jury out of the courtroom for a recess while the court considered the parties' arguments. Once Cummins took the stand, counsel for both Newton and Riley strongly objected to the prosecutor's questions and requested a mistrial. During the questioning, the trial court also held several side bar conferences out of the jury's hearing. Throughout the long, hotly contested issue of Cummins's testimony, the trial court gave no explanation or cautionary instruction to the jury. For example, it did not instruct the jury not to draw any adverse inferences from Cummins's refusal to testify. The jury was simply left to speculate about what was happening in the courtroom.

Moreover, each of the questions the prosecutor asked Cummins was a detailed, leading question which put the prosecution's version of the facts before the jury. For example, the prosecutor asked Cummins the following:

> Prosecutor: In that statement [that Cummins made to Detective Parker], is it true that you told him that on April 1st of 1993 when Lester arrived at 909 South Peoria Street, Apartment Number 10, that Lester Newton and Tyree Bronson were at the door initially, and that after they entered Shervin went to close the door when two individuals, McCoy and Riley, came in?

> Cummins: I refuse to answer any of your questions. It was obvious that Cummins was an important witness because her statement to the detective contradicted Newton's "three robbers" theory. In this context, Cummins's repeated invocation of her Fifth Amendment right could have given rise to an inference that Cummins was criminally liable for what she told Detective Parker and that Detective Parker's testimony should therefore be afforded greater weight than it otherwise would have had if Cummins never took the stand. Thus, given the leading questions which allowed the prosecution to advance its theory of the case, the sheer number of times Cummins invoked her privilege, the lack of any explanation or instruction to the jury from the trial court, the significance of Cummins's testimony, and the possible adverse inferences that a jury could draw from her refusal to answer the questions, we conclude that Newton was unfairly prejudiced in violation of *Namet* and *Douglas*.

---

**10.** During closing arguments, the prosecutor made the following statement related to Cummins's statement to Detective Parker:

> [Prosecutor]: Now at this point inside G–10 already there are Samuel and Shervin Bunch. Shervin lives there, his brother Samuel lives there. Also inside G–10 is Evon[ne] Cummins. And Evon[ne] Cummins tells us that Lester Newton, Gregory McCoy, Ronald Riley, and Tyree Bronson all come in.

During the prosecutor's closing rebuttal argument, the following exchange took place:

> [Prosecutor]: Evon[ne], who is Lester's girlfriend, is interviewed with her mother present. And during that interview what does she say? Lester Newton, Greg McCoy, Tyree Bronson, and Ronald Riley came into that apartment together, and she's still a girlfriend when she's saying this. She's still a girlfriend of Mr. New-

ton. Why is she willing to burn Mr. Newton by saying that unless it's true? She has no reason—

> [Counsel for Riley]: I'm sorry. I have to object. She didn't use names. The evidence was that Detective Parker filled names in.

> [The Court]: Overruled. That's for the jury to determine.

> [Counsel for Riley]: Okay. Thank you.

> [Prosecutor]: Remember the testimony, because the Judge is right, you got to remember that, not what Detective Parker said, that Evon[ne] knew everybody's name but Riley, and she knew Lester Newton's name. He's her boyfriend. He didn't have to fill that in. She knew McCoy, she knew Bronson, she didn't know Riley, but it's very clear that she said Lester Newton came in with them.

## III.

In rejecting the People's argument that Cummins's statement to Detective Parker was admissible under CRE 804(b)(3), the court of appeals adopted the United States Supreme Court's interpretation in *Williamson* of a "statement" against interest under Fed.R.Evid. 804(b)(3). *See Newton*, 940 P.2d at 1068–69. The court of appeals' interpretation of CRE 804(b)(3) would require a trial court to analyze "each separate remark" that a declarant made within a larger narrative. *Id.* at 1068. It applied this technique by dissecting Cummins's statements into ten separate remarks. *See id.* at 1068–69. Under the court of appeals' opinion, only those individual remarks that are self-inculpatory could be admitted into evidence. *See id.* at 1069. All other remarks, including those that are related and collaterally neutral to the individual self-inculpatory remark, would not be admissible. We disagree with the court of appeals' analysis. Its interpretation of the rule is inconsistent with our case law, inconsistent with the history of CRE 804(b)(3), and unworkable in a practical sense.

■ In analyzing the admissibility of Cummins's statement, we proceed in the following manner. First, we discuss the requirements of admitting a statement against penal interest under CRE 804(b)(3). CRE 804(b)(3) allows for the admission of statements that exculpate the defendant, as well as statements that inculpate the defendant, such as Cummins's statement here. Because the text of CRE 804(b)(3) explicitly imposes a corroboration requirement for exculpatory statements only, we distinguish the associated requirements for both types of statements. Second, we turn to the scope of an admissible statement under CRE 804(b)(3) and explain that the Supreme Court's interpretation of the analogous federal rule in

*Williamson* is inconsistent with the Colorado Rules of Evidence. Accordingly, we delineate a broader approach to admitting statements against penal interest under CRE 804(b)(3) than the Supreme Court's interpretation of Fed.R.Evid. 804(b)(3). Under our interpretation of CRE 804(b)(3), a narrative's precise statement against penal interest and related, collaterally neutral statements are admissible subject to two limitations: 1) the trial court should exclude statements that are so self-serving as to be unreliable and 2) if the trial court determines that the declarant had a significant motivation to curry favorable treatment, then the entire narrative is inadmissible. Finally, because the issue of the admissibility of Cummins's statement is likely to arise on retrial, we apply our interpretation of CRE 804(b)(3) to her statement in order to assist the trial court at Newton's new trial.

### A. Admissibility of Hearsay Under CRE 804(b)(3)

■ As a general rule, parties are prohibited from introducing hearsay statements into evidence. *See* CRE 802; *Blecha v. People*, 962 P.2d 931, 937 (Colo.1998). The rule against hearsay exists because "[h]earsay statements are presumptively unreliable since the declarant is not present to explain the statement in context." *Blecha*, at 937. "Moreover, since the declarant is not subjected to cross-examination, the truthfulness of the statement is questionable ." *Id.*

■ In order for hearsay to be admissible in this context, a proffered hearsay statement must comply with the specific exception to the hearsay rule under which the statement is offered and must not offend the right to confrontation as guaranteed by the United States and Colorado Constitutions.[11] These two requirements—i .e., compliance with the specific rule of evidence allowing for the ad-

---

11. In our recent decision in *Blecha*, we applied the two-step test in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *see infra* note 13, for purposes of determining whether the defendant's right to confrontation under the Colorado Constitution was violated. *See Blecha*, 962 P.2d at 940–41. In applying this test, we noted that following its decision in *Roberts*, the United States Supreme Court "substantially lim-

ited the two-step federal constitutional analysis." *Id.* at 941. Because both parties in *Blecha* "assumed the continued vitality of the two-part test" under the Colorado Constitution, we followed the *Roberts* analysis. *Id.* We emphasized, however, that "in so doing we reach no decision on whether the two-part test ... retains its vitality in light of Supreme Court decisions and wait for another case to decide this issue." *Id.* at 941.

missibility of the hearsay statement and compliance with the confrontation clauses in the United States and Colorado Constitutions— do not necessarily involve identical inquiries. As the Supreme Court explained in *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), evidence admissible under a hearsay exception may not be admissible under the Confrontation Clause:

> Although we have recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values, we have also been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule.

(Citations omitted.) Conversely, in *Williamson,* the Supreme Court narrowly interpreted Fed.R.Evid. 804(b)(3) to require the exclusion of evidence that may otherwise be admissible under the Confrontation Clause. *See Williamson,* 512 U.S. at 600, 114 S.Ct. 2431 (recognizing that its interpretation of Fed. R. 804(b)(3) was not required under the Confrontation Clause and stating that "Congress certainly could, subject to the constraints of the Confrontation Clause, make statements admissible based on their proximity to self-inculpatory statements").[12] Recognizing that hearsay statements must comply with both the specific evidentiary rule and the defendant's right to confrontation, we now proceed to examine the requirements of CRE 804(b)(3).

CRE 804(b)(3), which is identical to Fed.R.Evid. 804(b)(3), is one of several hearsay exceptions that apply when the declarant is unavailable. *See* CRE 804(a), (b). The 804(b)(3) exception, commonly known as the

statement against interest exception, provides:

> Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

CRE 804(b)(3).

The text of the rule requires that "corroborating circumstances clearly indicate the trustworthiness of the statement" when the statement is offered to *exculpate* the accused. CRE 804(b)(3). While this court has not previously addressed the corroboration requirement for exculpatory statements, we note that federal courts and our own court of appeals have looked to both the circumstances surrounding the making of the statement, as well as independent evidence supporting the substance of the statement. *See, e.g., United States v. Lowe,* 65 F.3d 1137, 1146 (4th Cir.1995) (examining the circumstances surrounding the declarant's statement as well as determining whether independent evidence supported the statement); *United States v. Edelin,* 996 F.2d 1238, 1242 (D.C.Cir.1993) (same); *People v. Pack,* 797 P.2d 774, 776–77 (Colo.App.1990) (same). In 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 502, at 851 (2d ed.1994), the authors explain the general approach for determining whether corroborating circumstances clearly indicate the trustworthiness of a statement offered to exonerate the accused:

> relevant interests differently. Thus a particular hearsay rule may admit evidence that offends confrontation rights because the rule favors the need for evidence and its probable reliability over the defendant's confrontation rights. Conversely, a particular hearsay rule may restrict evidence, which nevertheless satisfies the confrontation clause because the rule favors increased protection for the defendant.

---

**12.** In Paul Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 5.04[1], at 5–17 (1996), the author provides the following useful description of the interrelationship between the Confrontation Clause and the hearsay rule:

> The reason that the hearsay rule and confrontation clause are not coterminous is not because the two provisions protect different interests, but because the two may balance the

Certainly the requirement [of corroboration for statements that exonerate the accused] is satisfied by independent evidence that directly or circumstantially tends to prove the points for which the statement is offered. But the term "corroborating circumstances" seems much broader, and reaches circumstantial evidence supporting the veracity of the speaker, including indications that the statement was against interest to an unusual or devastating degree or that he repeated the statement or could not have been motivated to falsify for the benefit of the accused.

(Footnotes omitted.)

■■■■ Accordingly, when a statement is offered to exculpate the accused under CRE 804(b)(3), a trial court should proceed as follows. First, the trial court must determine whether the statement complies with the rule, including whether corroborating circumstances clearly indicate the trustworthiness of the statement. In conducting the corroboration inquiry, the trial court may examine both the circumstances surrounding the statement as well as other independent evidence that supports the statement.

■■■■ Second, if the defendant does not waive his or her right to confrontation (i.e., the defendant opposes rather than seeks admission of the exculpatory statement), the trial court must determine whether admission of the statement violates the defendant's rights to confrontation. In *Wright*, the Supreme Court explained that, in cases involving a hearsay rule that is not firmly rooted, "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Wright*, 497 U.S. at 822, 110 S.Ct. 3139.[13] Thus, the reliability determination for purposes of Confrontation Clause analysis is narrower than the corroboration inquiry under CRE 804(b)(3). In assessing whether the statement possessed inherent trustworthiness for constitutional purposes, the trial court should examine only the circumstances surrounding the making of the statement. *See infra* pp. 575–576 and accompanying text discussing the appropriate factors.

This court also has not previously addressed the requirements of statements against penal interest offered to *inculpate* the accused, such as Cummins's statement here. The text of CRE 804(b)(3) does not impose a corroboration requirement for inculpatory statements. However, in *People v. Moore*, 693 P.2d 388, 390 (Colo.App.1984), the court of appeals applied a corroboration requirement to an accomplice's statement that was offered to inculpate the defendant. The *Moore* court stated that "since [the declarant's] statement *inculpates* one besides the declarant, i.e., [defendant], to be admissible the People must show by a preponderance of evidence that the attendant circumstances confirm the trustworthiness of the statement." *Moore*, 693 P.2d at 390 (empha-

**13.** In *People v. Dement*, 661 P.2d 675, 679–82 (Colo.1983), we followed the Supreme Court's two-part test established in *Roberts* for determining whether the admission of out-of-court declarations by an unavailable third party witness violates a defendant's rights under article II, section 16, of the Colorado Constitution. Under *Roberts*, the prosecution must either produce the hearsay declarant for cross-examination or demonstrate the declarant's unavailability. *See Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. In cases where the declarant is unavailable, the prosecution then must demonstrate that the proffered hearsay bears sufficient "indicia of reliability." *Id.* Such reliability may be inferred when the hearsay falls within a "firmly rooted" hearsay exception. *Id.* Otherwise, the prosecution must demonstrate that the evidence contains "particularized guarantees of trustworthiness." *Id.*

In *Williamson*, the Supreme Court noted that courts have split in answering the question of whether the statement against interest exception is firmly rooted. *See Williamson*, 512 U.S. at 605, 114 S.Ct. 2431. This court, however, has implicitly concluded that the statement against interest exception is not firmly rooted. In *People v. Drake*, 785 P.2d 1253, 1256 (Colo.1989), we followed *Roberts* and explained that the reliability of a statement against penal interest may be satisfied by "independent physical and circumstantial evidence." This statement in *Drake* recognized that statements against penal interest inculpating the accused are not firmly rooted exceptions to the hearsay rule. *See also People v. Fincham*, 799 P.2d 419, 422 (Colo.App.1990) ("While it is true that reliability *may* be inferred where the evidence falls within a firmly rooted exception, a declaration against penal interest is too large a class for meaningful Confrontation Clause analysis." (citation omitted)).

sis added). The *Moore* court's application of the corroborating circumstances requirement to inculpatory statements is consistent with several federal decisions interpreting Fed. R.Evid. 804(b)(3). *See, e.g., United States v. Taggart,* 944 F.2d 837, 840 (11th Cir.1991); *see also United States v. Seeley,* 892 F.2d 1, 2 (1st Cir.1989) (stating that "courts have interpreted the rule as implicitly imposing a similar [corroboration] requirement where the government uses the hearsay to *inculpate* ").[14]

After examining the case law, we conclude that the corroboration requirement for a statement that inculpates the accused is not the same as the corroboration requirement for a statement that exculpates the accused. Courts applying an implicit corroboration requirement for an inculpatory statement have put forth varying views as to the type of corroboration necessary in order to admit the statement. *See* 2 *McCormick on Evidence* § 319, at 347 n. 23 (John W. Strong ed., 4th ed.1992) (citing cases and explaining that "[w]hat corroboration means has been somewhat uncertain"). In determining whether a declarant's statement was sufficiently corroborated, some courts have turned to independent evidence introduced at trial that incriminates the defendant. *See, e.g., United States v. Gio,* 7 F.3d 1279, 1288 (7th Cir.1993) (explaining that the trustworthiness of the statement was corroborated in part by "other evidence presented at trial [that] independently verified [the declarant's] statement incriminating [the defendant]"). Other courts, however, have expressly limited the corroboration inquiry to an assessment of the circumstances surrounding the declarant's statement. *See, e.g., Casamento,* 887 F.2d at 1170 (explaining that "[i]n determining whether such a statement is trustworthy enough to be admissible, the district court must look to the circumstances in which the declarant made the statement").

Because the latter view—i.e., that only the circumstances surrounding the making of the statement should be examined—is constitutionally grounded, we are persuaded that this approach is the better method for analyzing the sufficiency of corroboration for a statement that inculpates the accused. Most courts that have required corroboration for inculpatory statements have done so out of concern that such statements comply with the Confrontation Clause. *See generally United States v. Candoli,* 870 F.2d 496, 510 (9th Cir.1989) ("Those circuits which have read 'the corroboration expressly required for exculpatory statements into the rule as applied to inculpatory statements [have done so] in order to satisfy the confrontation clause.' " (citation omitted) (alteration in *Candoli* )). It therefore makes sense that the corroboration requirement for inculpatory statements, which is rooted in the Confrontation Clause, complies with the Supreme Court's explanation in *Wright* that the Confrontation Clause can only be satisfied by looking to the inherent trustworthiness surrounding the making of the statement. *See McCormick on Evidence, supra,* § 319, at 347 n .23 (indicating that those courts that consider other evidence of guilt in a case as proper corroboration of inculpating statements are inconsistent with *Wright* and that "only the circumstances under which the statement was made, such as its degree of adversity to the declarant's interests and whether made in police custody, should be considered").[15] Moreover, this approach is also consistent with *Moore,* where our court of appeals considered only the "circumstances surrounding the making of the statement" to confirm the inculpatory statement's trustworthiness and reliability. *Moore,* 693 P.2d at 390.

 In summary, then, a trial court should follow a three-part test before relying

---

14. For other court decisions applying a corroboration requirement for inculpatory statements, see *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990); *United States v. Casamento,* 887 F.2d 1141, 1170 (2d Cir.1989); *United States v. Boyce,* 849 F.2d 833, 836 (3d Cir.1988); *United States v. Riley,* 657 F.2d 1377, 1383 (8th Cir.1981); *United States v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978).

15. As noted, we explained in *Drake* that the reliability of a statement against penal interest may be satisfied by "independent physical and circumstantial evidence." *Drake,* 785 P.2d at 1256. Our statement in *Drake* that the reliability of an inculpatory statement may be based on independent corroborating evidence was effectively overruled by *Wright.*

on CRE 804(b)(3) to admit a third party witness's statement that inculpates the defendant. First, the witness must be unavailable as required by CRE 804(a). Second, the statement must tend to subject the declarant to criminal liability. On this point, the trial court must determine whether a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. Third, the People must show by a preponderance of evidence that corroborating circumstances demonstrate the trustworthiness of the statement. In conducting this third inquiry, a trial court should limit its analysis to the circumstances surrounding the making of the statement and should not rely on other independent evidence that also implicates the defendant. Appropriate factors for a trial court to consider include: where and when the statement was made, to whom the statement was made, what prompted the statement, how the statement was made, and what the statement contained. *See State v. Wilson*, 323 Or. 498, 918 P.2d 826, 837–39 (Or.1996) (outlining the above factors).

### B. The Scope of an Admissible "Statement" Under CRE 804(b)(3)

CRE 804(b)(3) provides for the admission of a "statement" against the declarant's interest. The People urge us to construe a statement against interest broadly, arguing that the court of appeals' interpretation of an admissible statement is unnecessarily restrictive and results in an artificial dissection of a declarant's narrative. While we do not share the People's view that a declarant's entire narrative should be admissible so long as it contains within it a remark inculpating the declarant, we agree with the People that the court of appeals' interpretation of an admissible statement, based on the Supreme Court's decision in *Williamson*, is not a correct statement of Colorado law.

#### 1. *Williamson* and Fed.R.Evid. 804(b)(3)

In *Williamson*, the Supreme Court held that a "statement" for purposes of Fed. R.Evid. 804(b)(3) is limited to an individual self-inculpatory remark. *See Williamson*,

512 U.S. at 599–601, 114 S.Ct. 2431. The *Williamson* Court began its analysis by acknowledging that a "statement" may have a broad meaning, such as a "report or narrative," or may mean more narrowly "a single declaration or remark." *Id.* at 599, 114 S.Ct. 2431. The *Williamson* Court explained that, although the text of the rule does not answer the question of which meaning of "statement" should be followed, the "principle behind the Rule" supports the more narrow reading. *Id.* According to the Court's interpretation of Fed.R.Evid. 804(b)(3), the rule:

> does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.

*Id.* at 600–01, 114 S.Ct. 2431. As a result of *Williamson*, statements that are collaterally neutral and related to the inculpatory remark are not admissible under the federal rule.

In his concurring opinion, Justice Kennedy strongly disagreed with the majority's interpretation of Fed.R.Evid. 804(b)(3). *See Williamson*, 512 U.S. at 611–21, 114 S.Ct. 2431 (Kennedy, J., concurring). Justice Kennedy summarized the three generally accepted, competing views regarding the admissibility of a declarant's statements that are collateral, related declarations to the directly inculpatory statement. *See id.* at 611–12, 114 S.Ct. 2431. Dean Wigmore argued, as do the People here, that every fact contained in the statement should be admitted because " 'the statement is made under circumstances fairly indicating the declarant's sincerity and accuracy.' " *Id.* at 612, 114 S.Ct. 2431 (quoting 5 J. Wigmore, *Evidence*, § 1465, at 271 (3d ed.1940)). Dean McCormick took a more guarded view than did Dean Wigmore by arguing that collateral statements of a neutral character should be admitted, while collateral statements of a self-serving character should not. *See id.* (summarizing Dean McCormick's view and citing C. McCormick, *Law of Evidence* § 256, at 552–53 (1954)). Professor Jefferson, taking the most narrow view of the three, argued that only the proof of the fact against interest should be admitted. *See id.* (summarizing Professor Jefferson's view and citing Jefferson, *Declarations*

*Against Interest: An Exception to the Hearsay Rule,* 58 Harv. L.Rev. 1, 62–63 (1944)). Concluding that the majority's view was too narrow, Justice Kennedy advocated an approach similar to Dean McCormick's perspective.

### 2. The Colorado Rule

 The People and Newton agree that Colorado case law has interpreted CRE 804(b)(3) more broadly than the Supreme Court interpreted Fed.R.Evid. 804(b)(3) in *Williamson.*[16] For example, the *Moore* court explained that the declarant's statement was admissible under CRE 804(b)(3) "because it would have been probative in a trial against him," which as the People correctly note, is a significantly broader standard than the *Williamson* approach. It is also indisputable that this court is not bound to follow interpretations of federal rules of evidence that are identical to our rules of evidence. *See, e.g., People v. Garner,* 806 P.2d 366, 372 (Colo.1991) (declining to follow the United States Supreme Court's interpretation of Fed.R.Evid. 104 under *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). We find for several reasons that a more permissive approach to admitting statements against interest than the one announced by the *Williamson* Court is consistent with Colorado case law and represents the better evidentiary policy.

First, a broader reading of CRE 804(b)(3) comports with the type of statement that was admissible under our common law prior to the adoption of the Colorado Rules of Evidence. Our case law allowed for the admission of a statement against interest that included collaterally neutral facts. *See, e.g., Western Auto. Supply Co. v. Washburn,* 112 Colo. 430, 433–39, 149 P.2d 804, 805–08 (1944); *In re Estate of Granberry,* 30 Colo.

App. 590, 594–95, 498 P.2d 960, 962–63 (1972). In *Washburn,* this court considered the admissibility of an employee's written and oral statements describing the details of an accident which allegedly caused the employee to sustain an injury. *See Washburn,* 112 Colo. at 433–39, 149 P.2d at 805–08. The statements included a series of collaterally neutral remarks about the employee's history with the employer and details of the events underlying the injury. *See id.* at 433–35, 149 P.2d at 805–06. The statements also contained an acknowledgment that there were no witnesses to the injury, which, as we explained, was against the employee's interest because the type of injury sustained by the employee "requir[ed] certainty of proof." *Id.* at 438, 149 P.2d at 807. Because the statements contained this acknowledgment, we held that the trial court erred by not allowing the employer to admit the broader statements into evidence.[17] *See id.* at 439, 149 P.2d at 808. Given the state of the common law concerning statements against interest, the question is whether the Colorado Rules of Evidence intended to narrow this hearsay exception. We answer that question in the negative.

Adoption of the Colorado Rules of Evidence codified the common law in some respects and changed it in others. As then-Judge Quinn explained in his exhaustive review of the Colorado Rules of Evidence, CRE 803 and CRE 804 "generally follow the traditional common law exceptions as progressively broadened over the years." Joseph R. Quinn, *Hearsay in Criminal Cases Under the Colorado Rules of Evidence: An Overview,* 50 Colo. L.Rev. 277, 312 (1978–79). If CRE 804(b)(3) effected any change in our common law, the rule actually *expanded* the admissibility of statements against interest by extending it to statements against *penal*

---

16. In his answer brief, Newton states, "The Colorado construction ... does not require the fact-intensive inquiry or segmented analysis of each separate statement within a narrative." The People similarly note in their reply brief that "the traditional Colorado approach will result in the admission of more evidence, and in the form of broad narratives, while the *Williamson* rule will result in the admission of less evidence, and admission in the form of segmented snippets."

17. The *Washburn* court's analysis was consistent with the general common law, which admitted a declaration against interest "not only to prove the disserving fact stated, but also to prove other facts contained in collateral statements connected with the disserving statement." *Williamson,* 512 U.S. at 615, 114 S.Ct. 2431 (Kennedy, J., concurring) (quoting Jefferson, *supra,* at 57).

interest. *See* Quinn, *supra*, at 335 (explaining that CRE 804(b)(3) made a "substantial inroad upon the restrictions imposed by case law for admissibility of declarations against interest" by allowing for the admission of statements against penal interest, in addition to statements against pecuniary and proprietary interests); CRE 804(b)(3) advisory committee's note (noting that "Colorado's precedent concerning statements against interest is sparse, with possible limitation to statements against declarant's pecuniary or proprietary interests"). In its decision limiting the admissibility of a statement against interest to each precise self-inculpatory remark, the court of appeals significantly and erroneously departed from the types of admissible statements against interest that existed under common law, which CRE 804 intended to follow.

Second, severing collaterally neutral statements from each precise self-inculpatory remark deprives the jury of important context surrounding that self-inculpatory remark. In our view, this approach places too great an emphasis on the policy against admitting hearsay while undervaluing the need for meaningful evidence in criminal cases. *See* Juliana Gortner, Note, *The Admissibility of Inculpatory Statements in Washington Under the Rule for Declarations Against Interest After Williamson v. United States*, 70 Wash. L.Rev. 859, 870 (1995) (criticizing *Williamson* for "fail[ing] to accommodate the critical need for meaningful evidence in criminal cases when sufficient protection can be afforded in a more balanced way").[18] As the court of appeals' attempt to parse Cummins's

statement demonstrates, the surgical precision called for by *Williamson* is highly artificial and nearly impossible to apply.

Third, as Justice Kennedy aptly observed, a narrow interpretation of the rule would apply equally to statements offered by a defendant to exculpate the defendant, as well as those that inculpate the defendant. *See Williamson*, 512 U.S. at 617, 114 S.Ct. 2431 ("Thus, if the declarant said, 'I robbed the store alone,' only the portion of the statement in which the declarant said 'I robbed the store' could be introduced by a criminal defendant on trial for the robbery. That seems extraordinary." (citations omitted)). CRE 804(b)(3) already requires a defendant seeking to admit a statement exculpating the defendant to show that corroborating circumstances clearly indicate the trustworthiness of the statement. The court of appeals' narrow interpretation of the rule would impose an additional hurdle to the admission of such statements, thereby making it more difficult for a defendant to present relevant evidence supporting a theory of non-involvement in the alleged crime.

We therefore reject the court of appeals' interpretation of CRE 804(b)(3). We hold that a narrative's precise statement against penal interest and related, collaterally neutral statements are admissible under CRE 804(b)(3). When a party seeks to introduce a statement under CRE 804(b)(3), a trial court should determine whether the statement sought to be introduced contains a fact against the declarant's penal interest. If

---

**18.** Gortner illuminates the adverse evidentiary consequences that would result from following *Williamson* by posing the following hypothetical confession:

> [Jane]: My boyfriend John was at my house and overheard my mom and me fighting in the kitchen. John came in to intervene and my mom got out of control. I went to my room to get a gun that I keep for protection. When I returned, my mom had pushed John to the ground and was standing over him with a butcher knife. I threw him the gun and he ended up shooting her. When I realized she was still conscious, I grabbed the gun and shot her again.

Gortner, *supra*, at 877. Gortner explains that under *Williamson*, all non-disserving remarks, including all comments incriminating John,

would not be admissible "because none of the individual inculpatory remarks in this example are also against the declarant's own penal interest." *Id.* at 878. Thus, only those phrases that directly incriminate Jane, such as her actions to get the gun and her own participation in the shooting, would be admissible. *See id.* For example, a court might apply *Williamson* by reducing the statement to "I went to my room to get a gun .... I threw ... the gun .... When I realized she was still conscious, I grabbed the gun and shot her again." *Id.* at 880. Gortner concludes that this approach "would leave a string of remarks without context, purely against Jane's interest, that would be useless against John in his trial unless other evidence established a conspiracy or joint action between Jane and John." *Id.* at 878.

it does, then the trial court "should admit all statements related to the precise statement against penal interest, subject to two limits." *Williamson*, 512 U.S. at 620, 114 S.Ct. 2431 (Kennedy, J., concurring). First, statements that are so self-serving as to be unreliable should be excluded. Second, if the trial court determines that the declarant had a significant motivation to curry favorable treatment, then the entire narrative is inadmissible.

### 3. Cummins's Statement to Detective Parker

The admissibility of Cummins's statement to Detective Parker is likely to arise during a retrial. Although further fact-finding and changed circumstances may obviate the need to address this issue, we nevertheless proceed to provide guidance on the admissibility of the statement under our interpretation of CRE 804(b)(3) and the three-part test we announced in part III–A of this opinion. *See, e .g., Goebel v. Colorado Dep't of Insts.*, 764 P.2d 785, 804 (Colo.1988) (offering guidance to the trial court on an issue likely to arise on retrial); *People v. Roark*, 643 P.2d 756, 766–74 (Colo.1982) (same).

#### a. Unavailability

CRE 804(a)(2) includes within the definition of an unavailable witness a declarant who "persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." As made clear in *Blecha*, the determination of unavailability must be made at the time of trial. *See Blecha*, 962 P.2d at 940. Here, although the People offered Cummins immunity and the trial court ordered her to testify, Cummins refused to answer the prosecution's questions. Accordingly, under the facts existing at the time this case was tried, she was an unavailable witness under CRE 804(a)(2). If Cummins refuses to testify at Newton's retrial, she would be an unavailable witness.

#### b. Statement Against Penal Interest

Under section 18–8–105(1), 6 C.R.S. (1997), "A person is an accessory to a crime if, with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he renders assistance to such person." Rendering assistance includes situations where a person "[w]arn[s] such person of impending discovery or apprehension." § 18–8–105(2)(b), 6 C.R.S. (1997). A person with knowledge that the person she assists "has committed" a crime is punished more severely than a person with knowledge that the person assisted "is suspected of or wanted for" a crime. § 18–8–105(3)–(6), 6 C.R.S. (1997).

Here, Cummins's statement to Detective Parker would subject her to liability as an accessory. Unless she believed the statement to be true, a reasonable person would not inform a police officer that she was aware of a robbery that had just occurred, that she knew the persons involved in that crime, that she witnessed the robbers enter the apartment she was occupying, that she left the apartment and saw the police surround the apartment, and that she informed the robbery participants of the police officers' presence. Taken together, these statements would support a finding that Cummins violated the law and are thus against her penal interests.

If the trial court finds on retrial that Cummins's statements were not made to curry favor, then the entire narrative would be admissible. As discussed, Detective Parker testified that Cummins told him that she was at apartment # 10 on the morning of April 1, 1993 when Newton, Bronson, Riley, and McCoy entered. After these four persons went to the bedroom of the apartment, Cummins informed Shervin Bunch that the four had just committed a robbery. Bunch then went into the bedroom for several minutes. Newton emerged from the bedroom wearing a different outfit from the outfit he was wearing when he entered the apartment. Cummins then went to take the trash outside and observed the police. Upon returning to the apartment, she informed everyone about the police's presence. Newton told everyone "to be cool because the cops couldn't come in." When the police knocked at the door, Bronson, McCoy, and Riley left the apartment through the window and started running. All of these remarks either subject Cummins to criminal liability as an accessory

or are collaterally neutral. The statements are not so self-serving as to be unreliable. Hence, the entire narrative would be admissible under CRE 804(b)(3) if Cummins did not make the statement in order to curry favor.

c.

On retrial, the trial court must determine whether the circumstances surrounding Cummins's statement to Detective Parker demonstrate the trustworthiness of that statement. In making this determination, the trial court should apply the factors we described in part III–A of this opinion.

IV.

In summary, we hold that the trial court's error in allowing the People to call Cummins to the stand warrants reversal of Newton's convictions. We therefore affirm the court of appeals' judgment reversing Newton's convictions. However, we reject the court of appeals' adoption of *Williamson* for purposes of CRE 804(b)(3). Under our interpretation of the rule, a trial court should admit all statements related to the precise statement against penal interest subject to the limitations we delineated in this opinion. Accordingly, we affirm the court of appeals and return this case with directions to remand it to the trial court for further proceedings consistent with this opinion.

Justice KOURLIS concurs and specially concurs. Justice SCOTT joins in the concurrence and special concurrence.

Justice KOURLIS, concurring and specially concurring.

I concur with the result reached by the majority and with the court's analysis in Parts I and III. I write separately only to express my concern that the majority's analysis in Part II extends beyond the scope of our grant of certiorari.

We granted certiorari in this case to determine whether the court of appeals erred in adopting or applying the rule of *Williamson v. United States*, 512 U.S. 594, 114 S.Ct.

2431, 129 L.Ed.2d 476 (1994), regarding the hearsay exception for statements against penal interest. The court of appeals determined that Cummins's statement at issue was improperly admitted into evidence, and reversed and remanded for a new trial on that basis alone. The majority resolves the certiorari issue by concluding that the court of appeals did err. Therefore, the majority affirms the judgment of the court of appeals, but sets forth a new test for admissibility of Cummins's statement on retrial.

In the context of seeking to admit Cummins's hearsay statement at trial, the People called Cummins to the stand knowing that she would invoke her privilege against self-incrimination. In fact, she did repeatedly invoke her privilege in the presence of the jury.

The court of appeals announced at the beginning of its opinion that a "party may not call a witness to testify if that party knows the witness will exercise her privilege against self incrimination." *People v. Newton*, 940 P.2d 1065, 1067 (Colo.App.1996). However, the court of appeals discussed the issue solely in the context of determining whether or not the subsequent admission of Cummins's out-of-court statement was harmless. Since the court of appeals reversed and remanded on the basis of the hearsay statement, it did not specifically address the impact of Cummins's invocation of privilege on the witness stand. It did not speak to the question of when and whether calling a witness to the stand knowing that such witness would invoke the privilege against self-incrimination should constitute reversible error, and it did not address the standards that should govern such an inquiry.

Because the court of appeals did not fully address the self-incrimination question, neither party sought certiorari on that issue. Neither party briefed the issue of the consequences that should follow from such an error. The People argued merely that this court should reverse the decision of the court of appeals concerning the admissibility of Cummins's narrative and remand for consideration of the remaining appellate claims.[1]

---

**1.** The majority points out that the People dis-

cussed in the People's reply brief on certiorari

The majority reads the court of appeals' opinion as implicitly concluding that the error in permitting the People to call Cummins to the stand knowing that she would invoke her privilege was not automatically reversible. *See* maj. op. at 569. The majority then specifically joins the issue of whether such an error was reversible in this instance, and delineates the appropriate standards.

The majority makes that choice in the interests of judicial economy. *See* maj. op. at 570 n. 8. Although I certainly share the goals of minimizing expense and passage of time in litigation and maximizing the use of judicial resources, I nonetheless would decline to reach an issue that is not properly before us. *See In re Marriage of Booker,* 833 P.2d 734, 740 (Colo.1992) (Vollack, J., concurring); *Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900, 907 (Colo.1982). The immediate danger is that we do not have the benefit of the parties' briefs and argument on point, as well as the benefit of any amicus briefs that might be tendered. The further danger is more systemic. This court is principally a court of certiorari jurisdiction. When we grant certiorari on a particular issue, our review is then confined to that issue. *See* C.A.R. 53 ("The statement of an issue presented will be deemed to include every subsidiary issue clearly comprised therein. Only the issues set forth or clearly comprised therein will be considered.").

I do not view the issue presented and resolved in Part II of the majority opinion to be included within our grant of certiorari, and I do not think the court has the discretion to entertain issues not properly before it. I would, thus, reverse the court of appeals on the admissibility of Cummins's statement and remand to that court for further resolution of remaining appellate issues, including the impact of Cummins's invocation of the privilege against self-incrimination before the jury.

and during oral arguments the impact of the trial court's decision to allow the prosecution to repeatedly question Cummins despite her claim of Fifth Amendment privilege. According to the majority, these discussions by the People "are consistent" with the majority's decision to take a position on this issue. In the People's reply brief, however, the issue was raised solely to point out that the Respondent's opposition brief

I am authorized to state that JUSTICE SCOTT joins in this concurrence and special concurrence.

had improperly characterized the court of appeals' holding on the *Williamson* issues as dicta, when in fact the court of appeals' analysis of CRE 804 determined the outcome of the case. The interrelationship between the evidentiary issue and the invocation of privilege issue has been contextual only. As such, the invocation of privilege issue is not necessary or subsidiary to our certiorari issues.